The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Neill Fuleihan. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is 52 years of age. He completed the tenth grade and has a GED. His vocational background consists of employment in the trucking industry as a driver and as an owner-operator, employment as an insurance agent, and self-employment in automobile sales. His medical history is significant for a coronary bypass in 1987 and ongoing elevated cholesterol and hypertension.
2. On 6 June 1991, plaintiff was an owner-operator under a lease agreement with defendant employer, a trucking company, and had been in such a capacity for approximately 11 weeks.
3. On 6 June 1991, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant employer when a 40 pound bulkhead fell onto the top of plaintiff's left foot from a height of approximately four feet, resulting in an injury to plaintiff's left foot.
4. Defendant employer accepted liability for plaintiff's compensable injury and entered into a Form 21 Agreement with plaintiff which was approved by the Industrial Commission on 9 July 1991. The average weekly wage set forth on the Agreement, $1,469.58, was obtained from the Form 19 which had been prepared by defendant employer's employee Judy Johnson and reflected plaintiff's gross trip earnings divided by the number of weeks worked but did not take into consideration plaintiff's expenses incurred in generating his gross trip earnings. Plaintiff signed the Form 21 Agreement and his signature was, in effect, his acknowledgement that his average weekly wage was $1,469.58.
5. Based upon the average weekly wage contained on the Form 21 Agreement, defendant initiated payment of compensation to plaintiff at the rate of $406.00 per week, the maximum compensation rate on the date of his compensable injury, beginning 8 June 1991.
6. For his compensable injury, plaintiff was seen at Forsyth Memorial Hospital and Wesley Long Hospital, and by Drs. Parker and Lavender; and underwent treatment for left foot contusion, hematoma and cellulitis, including surgical decompression of a blood clot performed by Dr. Lavender on 16 June 1991. Plaintiff remained under Dr. Lavender's care until he was released to return to work without restriction on 13 August 1991.
7. Thereafter, plaintiff did not return to work with defendant, but instead entered into an owner-operator lease agreement with Morgan Drive-A-Way on 15 August 1991 under which he worked until approximately 9 October 1991. During this period of time, plaintiff did not inform defendant of his lease agreement with Morgan Drive-A-Way and continued to receive his weekly workers' compensation indemnity benefits. Plaintiff hired someone else to drive his truck during some of this period of time at approximately 25 percent of his gross receipts, obstensibly due to plaintiff's inability to drive his truck due to pain and swelling in his left foot; however, there is insufficient evidence of record from which to determine by its greater weight how long this arrangement existed or how much income plaintiff paid his driver.
8. On 9 October 1991, plaintiff returned to Dr. Lavender with complaints of pain and swelling in his left foot. Upon examination, some swelling was present. Dr. Lavender took plaintiff out of work and prescribed orthopedic shoes and a physical therapy program which plaintiff failed to complete, obstensibly due to pain in his left foot. Thereafter, Dr. Lavender ordered further diagnostic testing consisting of a bone scan, the results of which were normal. As early as 12 December 1991, Dr. Lavender was of the opinion that plaintiff could not return to work as a truck driver or to any work which required prolonged standing.
9. On 8 January 1992, plaintiff was evaluated by Dr. Noah at the request of the third party administrator.
10. On 29 January 1992, plaintiff underwent vocational evaluation performed by the North Carolina State Division of Vocational Rehabilitation Services. Plaintiff's performance on measures of general mental ability and reading comprehension suggested that he would have difficulty retraining in an academic setting, such as a community college degree program.
11. Beginning February of 1992, defendant provided medical case management services to plaintiff which lasted until September of 1992.
12. Dr. Lavender released plaintiff from his care on 29 May 1992 at which time plaintiff was released to return to work as tolerated by pain, but was restricted from returning to work as a truck driver or to any employment which required prolonged standing. Plaintiff did not return to work with defendant or to any other employment at that time.
13. On 13 October 1992, plaintiff underwent a functional capacity evaluation during the course of which he provided submaximal effort and exhibited symptom magnification. At that time, plaintiff was capable of engaging in light duty employment.
14. In November of 1992, defendant, through the third party administrator, initiated vocational rehabilitation and job placement services, which continued until July of 1993. During this time, the Industrial Commission ordered plaintiff, on 3 December 1992 and again on 29 March 1993, pursuant to Form 24 applications filed with the Industrial Commission by defendant and the third party administrator, to comply with vocational rehabilitation provided by defendant. During this time, plaintiff minimally complied with the procedural aspects of vocational rehabilitation such as filling out job logs, locating job leads on his own, and submitting applications; however, the conduct of plaintiff's counsel, including but not limited to, his making personal attacks on the vocational rehabilitation specialist(s) assigned to provide vocational rehabilitation and job placement services to plaintiff and his statements to the vocational rehabilitation specialist(s) in plaintiff's presence that plaintiff was permanently and totally disabled and that there was no way they could find plaintiff a job, which actions were obstructionist in nature, as well as plaintiff's own refusal to participate in vocational rehabilitation activities designed to enhance his job search skills such as completion of a sample application when initially asked to do so and then an incomplete effort when he finally did fill out the sample application, his refusal to fill out job applications in a legible manner or to seek assistance from the vocational rehabilitation specialist(s) assigned to assist him in doing so, his failure to timely follow up on job leads, his refusal to follow up on certain job leads that were within his restrictions such as parking lot attendant, telemarketer, video store manager, bus driver, work in convenience stores, sales clerk jobs or delivery positions, and his presentation to prospective employers that he was not interested in the job that he was applying for but that he was there because he had to be as well as his complaints to the same of his incapacitating medical problems, were, as of 29 March 1993, tantamount to a refusal to accept rehabilitation services which plaintiff had been ordered by the Industrial Commission to accept.
15. In July of 1993, plaintiff informed the vocational rehabilitation specialist that he had been approved for Social Security Disability Income and would no longer participate in vocational rehabilitation and job placement services or look for employment. Thereafter, vocational rehabilitation and job placement services, which had earlier been scaled back in terms of periodic meetings between plaintiff, his attorney and the vocational rehabilitation specialist(s) due to the deteriorating relationship between the parties resulting from the matters more explicitly set forth in Finding of Fact #14 hereinabove, were suspended.
16. Plaintiff's refusal to accept vocational rehabilitation services as ordered by the Industrial Commission was continuing as of the close of the evidentiary record in this case.
17. Plaintiff was seen by Dr. Noah again on 9 February 1993, at which time he was able to return to work as a truck driver, even driving a truck which required the operation of a clutch.
18. On 3 December 1993, a Form 24 was approved by the Industrial Commission and defendant ceased paying compensation as of that date.
19. Plaintiff contends that he still has constant pain and swelling in his left foot which renders him unable to work in any employment.
20. Based upon the testimony and demeanor of plaintiff, the testimony and demeanor of the other witnesses who testified at the evidentiary hearing in this case, and the other voluminous evidence of record, the undersigned does not accept as credible plaintiff's testimony, including his testimony concerning the incapacitating nature of his left foot pain.
21. Inasmuch as plaintiff returned to work on or about 15 August 1991 as an owner-operator under a lease agreement and worked in that capacity until approximately 9 October 1991, but failed to report the same to defendant or the third party administrator while he continued to receive weekly workers' compensation indemnity benefits, which action in and of itself compromises plaintiff's credibility; inasmuch as during that period of time plaintiff had the capacity to earn the same wages he was earning at the time of his 16 June 1991 compensable injury, having been returned to work without restriction on 13 August 1991; and inasmuch as there is insufficient evidence of record from which to determine by its greater weight what plaintiff's actual earnings were during that period, it is reasonable to infer that plaintiff did not sustain any diminution in wage earning capacity from 15 August 1991 to 9 October 1991.
22. The general rule in the trucking industry is that owner-operators under lease agreements receive as net income approximately one-third of their gross revenues after deducting expenses incurred in generating said gross revenue.
23. Subsequent to approval of the Form 21 Agreement, defendant provided the third party administrator with operator settlement statements which revealed that plaintiff's average weekly wage as set forth on the Form Agreement, $1,469.58, which amount reflected plaintiff's gross trip earnings divided by the number of weeks worked for defendant as of the date of his compensable injury, did not take into consideration plaintiff's expenses incurred in generating his gross revenue. At the time the defendant, through the third party administrator, entered into the Form 21 Agreement, defendant was operating under a mistake of fact as to plaintiff's average weekly wage. At the time plaintiff entered into the Form 21 Agreement he knew that his expenses in generating his gross income were considerable; however, giving plaintiff the benefit of the doubt that he was not misrepresenting his average weekly wage when he acknowledged the same by signing the Form 21, plaintiff was operating under a mistake of fact as to what constituted his average weekly wage.
24. At the time the Form 21 Agreement was entered into between the parties, the parties were operating under a mutual mistake of fact as to plaintiff's average weekly wage.
25. Inasmuch as the evidence of record concerning plaintiff's average weekly wage on 6 June 1991 consists of tax returns for calendar years 1990 and 1991 from which can be derived plaintiff's earnings during those calendar years, and 11 weeks of operator settlement statements which reflect some of plaintiff's expenses incurred in generating gross revenue but which settlement statements, while providing for deductions and reimbursements, do not reflect all of plaintiff's expenses incurred in generating his gross revenue, the fairest method of ascertaining plaintiff's average weekly wage as an owner-operator under a lease agreement which will most nearly approximate the amount that plaintiff would have earned were it not for his 6 June 1991 compensable injury, is to take the average of plaintiff's gross trip earnings during his 11 weeks of employment with defendant, $1,469.58, and multiply that by one-third, which represents the general rule in the trucking industry of what an owner-operator under a lease agreement nets after deducting operating expenses, which in this case results in an average weekly age of $489.37.
26. The mutual mistake of the parties as to plaintiff's average weekly wage is a material mistake which significantly affects the amount of workers' compensation indemnity benefits paid to plaintiff. An average weekly wage of $1,469.58 results in the maximum compensation rate for 1991 of $406.00 whereas an average weekly wage of $489.37 per week results in a compensation rate of $326.26.
27. As a result of the mutual mistake of the parties, plaintiff has been over-paid workers' compensation indemnity benefits in the amount of $79.74 per week for each week plaintiff received workers' compensation benefits.
28. As a result of his 6 June 1991 compensable injury, plaintiff was unable to earn any wages in any employment from 8 June 1991 to 15 August 1991 and from 9 October 1991 to 29 March 1993.
29. As a result of his 6 June 1991 compensable injury, plaintiff has a seven and one-half percent permanent partial impairment to his left foot.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 6 June 1991, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant employer. N.C. Gen. Stat. § 97-2(6).
2. On 6 June 1991, plaintiff's average weekly wage was $489.37 per week. N.C. Gen. Stat. § 97-2(5).
3. The Form 21 Agreement that was entered into by the parties subsequent to plaintiff's 6 June 1991 injury by accident which was approved by the Industrial Commission on 9 July 1991, contains a mutual mistake of fact with respect to the average weekly wage and compensation rate stated on the Form 21 Agreement, said average weekly wage actually being $489.37 per week rather than $1,469.58 per week and, consequently, the Form 21 Agreement approved by the Industrial Commission on 9 July 1991 should be set aside because of mutual mistake of fact. N.C. Gen. Stat. §97-17.
4. Inasmuch as plaintiff's actions as of 29 March 1993 constituted a refusal to accept vocational rehabilitation and job placement services which he had been ordered to accept by Orders of the Industrial Commission dated 3 December 1992 and 29 March 1993, and inasmuch as plaintiff's refusal was continuing as of the close of the evidentiary record in this case, plaintiff is barred from receiving compensation during the period of such refusal which began 29 March 1993 and was continuing as of the date of this Opinion and Award. N.C. Gen. Stat. § 97-25.
5. As a result of his 6 June 1991 injury by accident, plaintiff was temporarily totally disabled from 8 June 1991 to 15 August 1991 and from 9 October 1991 to 29 March 1993, for which he is entitled to compensation at the rate of $326.26 per week for the aforementioned period subject to a credit to defendant for compensation paid heretofore. N.C. Gen. Stat. § 97-29.
6. As a result of his 6 June 1991 injury by accident, plaintiff sustained a seven and one-half percent permanent partial impairment of his right foot for which he is entitled to 10.8 weeks of compensation at the rate of $326.26 per week subject to a credit to defendant for compensation paid heretofore. N.C. Gen. Stat. § 97-31(14).
7. As a result of his 6 June 1991 injury by accident, plaintiff is entitled to have defendant pay all medical expenses incurred to the extent that the same tend to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. The Form 21 Agreement approved by the Commission on 9 July 1991 is hereby SET ASIDE due to mutual mistake of fact as to the amount of average weekly wage and compensation rate contained thereon. Inasmuch as defendant has over-paid compensation in the amount of $79.74 per week for each payment of compensation made; and inasmuch as defendant has over-paid compensation in terms of the number of weeks of compensation due and payable under the terms of this Opinion and Award, plaintiff is entitled to no further compensation under the North Carolina Workers' Compensation Act and defendant is entitled to a credit for the amount of its overpayment of compensation made to plaintiff heretofore.
2. Defendant shall pay all medical expenses incurred as a result of plaintiff's 6 June 1991 injury by accident to the extent the same are necessary to effect a cure, give relief or lessen the period of plaintiff's disability.
3. Each side shall pay its own costs, except that defendant shall pay expert witness fees in the amount of $240.00 to Dr. Dick Lavender, $200.00 to Kathryn Long and $225.00 to Sandra Locklear.
 S/ __________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ __________________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
S/ __________________ COY M. VANCE COMMISSIONER
DCS:bjp